FILED
2016 Sep-14  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHARON ANN SANDLIN, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.: **5:14-CV-1885-MHH** |
| | } | |
| CAROLYN W. COLVIN, | } | |
| Commissioner of the | } | |
| Social Security Administration, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Sharon Ann Sandlin seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Sandlin's claims for a period of disability and disability insurance benefits and supplemental security income. After careful review, the Court remands so that the Commissioner may fully consider Ms. Sandlin's request for a closed period of disability covering the months during which Ms. Sandlin was treated for breast cancer.

## I.   PROCEDURAL HISTORY

Ms. Sandlin applied for a period of disability and disability insurance benefits and supplemental security income on September 22, 2011. (Doc. 5-3, pp.

88, 96).  Ms. Sandlin alleges that her disability began on March 16, 2011.  (*Id.*

88).  Initially, Ms. Sandlin sought an indeterminate finding of disability.  The

Commissioner denied Ms. Sandlin's claims on November 3, 2011.  (Doc. 5-4, p.

2).[1]

Ms. Sandlin requested a hearing before an Administrative Law Judge (ALJ).

(*Id.* at 7).  During the administrative hearing, Ms. Sandlin's attorney suggested to

the ALJ that Ms. Sandlin might qualify for a "closed period of disability from

March 16, [2011] through at least November the 7th, 2012."  (Doc. 5-3, p. 59).

The ALJ issued an unfavorable decision on March 28, 2013.  (Doc. 5-3, p. 32).

The ALJ's opinion does not mention Ms. Sandlin's request for a closed period of

disability.

Ms. Sandlin sought relief from the Appeals Council.  In the proceedings

before the Appeals Council, Ms. Sandlin's attorney argued that the ALJ:

---

[1] Ms. Sandlin would not have been eligible for a closed period of disability at this stage of the
proceedings because she had not yet been absent from her job for more than 12 months.
Disability is defined as "an inability to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (A
claimant's impairments and inability to work must last for a continuous period of at least twelve
months); *Harvey v. Astrue*, 2009 WL 2634399, at *8 (M.D. Fla. Aug. 24, 2009) ("A closed
period of disability may be considered when a claimant had an impairment that: 1) prevented
substantial gainful activity for at least twelve (12) months, 2) continued to or through the month
of filing, and 3) ceased in or after the month of filing but prior to the date of adjudication.
POMS § DI 25510.01(A).  Thus, a claimant who is unable to point to a period of twelve (12)
consecutive months in which she was unable to engage in substantial gainful activity[] is
not entitled to a closed period of social security benefits.  *Phillips v. Barnhart*, 91 Fed. Appx. 775,
782 (3rd Cir. 2004); *Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 464 (6th Cir. 2003).").

did not consider a closed period of disability from March 16, 2011 to January 1, 2013.  That closed period of disability reflects the period of time that Ms. Sandlin was unable to work because of her cancer and treatment for her cancer.  Therefore, we believe that the decision of the Administrative Law Judge for the closed period is not supported by substantial evidence. . . .

(Doc. 5-3, p. 9).   On September 16, 2014, the Appeals Council declined Ms. Sandlin's request for review (*Id.* at 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited.   "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.   "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir.

2011) (internal quotations and citation omitted).  If the ALJ's factual findings are supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings."  *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards.  If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Sandlin has not engaged in substantial gainful activity since March 16, 2011, the alleged onset date.  (Doc. 5-3, p. 26). The ALJ determined that Ms. Sandlin's "breast cancer stage III status post double mastectomy and reconstructive surgery with residual effects of chemotherapy" are non-severe impairments.  (Doc. 5-3, p. 27).[2]  However, the ALJ concluded that "these medically determinable impairments may create functional deficits in combination with other symptoms that are severe."  (Doc. 5-3, p. 27; *see also* Doc. 5-3, p. 30 ("[Considering the totality of the evidence in the light most favorable to the claimant, the undersigned finds the combination of the claimant's impairments to be severe. . . .")).  Based on a review of the medical evidence in the administrative record, the ALJ concluded that Ms. Sandlin did not have an impairment or a combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 27-28).

In light of Ms. Sandlin's impairments, the ALJ evaluated her residual functional capacity (RFC).  The ALJ determined that Ms. Sandlin has the RFC to "perform the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)."  (Doc. 5-3, p. 28).  Based on this RFC, the ALJ concluded Ms.

---

[2]  The residual effects of Ms. Sandlin's chemotherapy include diarrhea, cramping, nausea, migraine headaches, fatigue, and neuropathy.  (Doc. 5-3, p. 29).

Sandlin is able to perform her past relevant work as an assembly operator and a general clerk.  (*Id.* at 31).  Accordingly, the ALJ determined that Ms. Sandlin has not been under a disability within the meaning of the Social Security Act.  (*Id.* at 32).

## IV.   ANALYSIS

Ms. Sandlin argues the ALJ's decision is subject to remand or reversal because the ALJ did not:

> address the issue of a closed period of disability for the Plaintiff, but instead determined that the Plaintiff was not disabled under the Social Security Act.  The Plaintiff contends that she was disabled for a closed period from March 16, 2011 to January 10, 2013 and that benefits should have been granted for that period and that the ALJ improperly applied 42 U.S.C.A. § 423(d)(5)(A) during that period and that the reasons given for rejecting the Plaintiff's testimony during that period are not supported by substantial evidence.

(Doc. 9, pp. 24-25) (citations omitted).[3]  The Court agrees that it is appropriate to ask the ALJ to address Ms. Sandlin's claim for a closed period of disability.

"A claimant may request benefits for a finite period of disability, even if she is later able to work.  In such 'closed period' cases, 'the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time

---

[3] Ms. Sandlin also argues that the ALJ's reliance on the opinion of Dr. Robert Estock to help determine the severity of her (Ms. Sandlin's) physical impairments is not supported by substantial evidence and that the ALJ's decision that the "general clerk" position was past relevant work is not supported by substantial evidence.  Because the Court finds that Ms. Sandlin's argument concerning the ALJ's failure to consider a closed period of disability is meritorious, the Court will not address Ms. Sandlin's alternative arguments.

which started and stopped prior to the date of his decision.'"  *Mitchell v. Comm'r of Soc. Sec.*, 393 Fed. Appx. 651, 652 (11th Cir. 2010) (quoting *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987)).   A claimant may raise the issue of a closed period of disability on appeal if the claimant has specified the dates that define the closed period for which benefits are sought.  *Jones v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 767, 772-73 (11th Cir. 2006).  As noted above, counsel for Ms. Sandlin identified the closed period for which she seeks benefits both during the administrative hearing in this case and in the proceedings before the Appeals Council, and she has presented the time frame clearly to this Court.  (Doc. 5-3, pp. 9, 59).[4]

The administrative record contains sufficient evidence of pain during the closed period to warrant remand for further proceedings.  "To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can

---

[4] In *Jones*, the claimant argued that "the ALJ should have considered [her] eligibility for a closed period of disability because [her] debilitating symptoms exceeded a 12-month duration."  181 Fed. Appx. at 772.  The Eleventh Circuit concluded that the ALJ did not err in failing to consider the claimant's eligibility for a closed period of disability because "Jones's argument on appeal does not sufficiently provide us with the specific 12–month time period for which she believes she is entitled to a closed period of disability" and because substantial evidence supported the ALJ's finding "that Jones was not disabled for any time during that entire period."  *Id.* at 773.  Here, Ms. Sandlin requested that the ALJ consider a closed period of disability and provided the ALJ, the Appeals Council, and this Court with the specific time period.

reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Commissioner of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).   A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

If the ALJ discredits a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225. "While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough. . . ." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam); *see* SSR 16-3P, 2016 WL 1119029 at *9 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

During her administrative hearing, Ms. Sandlin testified that while she was undergoing treatment for breast cancer, "I was throwing up.  I had cramps.  I had diarrhea.  I had migraines.  I stayed in the bed. . . Pretty much 24 hours a day." (Doc. 5-3, p. 49).  She stated:  "I wasn't sleeping.  I had neuropathy in my hands

and my feet.  And I was numb halfway down both arms and across my back and chest from the surgery." (*Id.* at 53).  She explained that her chemotherapy lasted from May 2011 until May 2012.  (*Id.* at 49).

Ms. Sandlin acknowledged that she worked for short periods during her cancer treatment to avoid losing her insurance and to keep her job, but she could not do her previous work as a press operator.  (*Id.* at 51-53).  Ms. Sandlin testified that she received accommodations from a supervisor who "had a family member that was also going through cancer and chemo."  Ms. Sandlin explained that her supervisor:

> put a chair in the bathroom where I could stay because he knew I was just trying to get my 30 days in and that I wasn't able to work. . . . I spent all my time sitting…. I had to keep a garbage can with me all the time.  I was throwing up, or I would spend the time in the bathroom because I had diarrhea so bad."

(*Id.* at 54).

Ms. Sandlin underwent reconstructive surgery on both breasts in August 2012 and again in January 2013.  She then returned to work.  (Doc. 5-3, p. 29; Doc. 5-10, pp. 103-105).[5]  Ms. Sandlin testified that as of January 2013, she was "trying to work an eight hour day."  (Doc. 5-3, pp. 43-44).  When she returned to work in January 2013, Ms. Sandlin handled paperwork rather than operating machinery.

---

[5] The ALJ noted that there are no medical records for the January 2013 procedure in the administrative record.  (Doc. 5-3, p. 30).  That is accurate, but there is a pre-op record from December 11, 2012.  (Doc. 5-10, pp. 108-109).

(*Id.* at 44).  She worked seven to eight hours a day, five days a week and made $17.00 an hour.  (*Id.* at 45).  She testified that Dr. Rayburn placed restrictions on lifting more than "5 pounds."  (*Id.* at 48).

The ALJ accurately summarized Ms. Sandlin's subjective testimony.  (Doc. 5-3, p. 29).  The ALJ correctly applied the first part of the pain standard, finding "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (*Id.*).  The ALJ then found that Ms. Sandlin's testimony concerning the "intensity, persistence and limiting effects" of her symptoms was not entirely credible.  (*Id.*).

The ALJ explained that Ms. Sandlin's medical records and treatment history are not consistent with her allegations of disabling pain.  The ALJ stated:

> Notably, the claimant alleges that during the period of chemotherapy treatment, she was unable to get out of bed most days and experienced nausea, vomiting, headaches and pain related to neuropathy; however complaints to this degree are not seen in the medical record.

(Doc. 5-3, p. 30).  Although some medical records in the administrative record indicate that Ms. Sandlin managed the side effects of chemotherapy well for periods of time, other records reflect that Ms. Sandlin suffered with severe side effects at other times during the treatment.

The medical records that were before the ALJ indicate that Ms. Sandlin was diagnosed with breast cancer on March 16, 2011.  (Doc. 5-8, pp. 13-14).  Two weeks later she underwent a double mastectomy.  (Doc. 5-9, pp. 4-6).  Ms. Sandlin

had a post-surgical check up with Dr. Seth Rayburn on April 4, 2011.  (*Id.* at 7).

Ms. Sandlin reported that "she [had] pain and nausea with movement of either

arm," but Dr. Rayburn found that Ms. Sandlin was "able to move her arms with

good motion," and her drains were intact.  (*Id.*).  Dr. Rayburn noted that Ms.

Sandlin was doing well and instructed her to continue wearing compressive

garments to aid her recovery.  (*Id.* at 8).  Three days later, Dr. Rayburn saw Ms.

Sandlin again.  She had less pain, but she had developed a burning sensation on her

right side.  (*Id.* at 9).  Dr. Rayburn prescribed Neurotin for the burning sensation

and told Ms. Sandlin that she could begin to ease the compressive garments.  (*Id.* at

10).

By April 14, 2011, Ms. Sandlin reported that her pain had subsided, and her

range of motion was good.  (Doc. 5-9, p. 11).  On April 21, 2011, Ms. Sandlin

stated that "she [was] doing well."  (Doc. 5-9, p. 13).  Ms. Sandlin received ports

for chemotherapy on May 4, 2011, and she began her chemotherapy regime eight

days later.  (*Id.* at 15).  When she began chemotherapy, Ms. Sandlin was still sore

from her surgical procedure, but otherwise, she was relatively healthy.  (*Id.* at 15-

16).

On May 5, 2011, Ms. Sandlin saw Dr. Brian Mathews.  Dr. Mathews started

Ms. Sandlin on the "standard protocol" medications for chemotherapy:

"[C]arboplatin, Taxotere, and Herceptin."  (Doc. 5-9, p. 83).  To address nausea,

Dr. Mathews prescribed Alovi, Decadron, and Emend.  (*Id.*).  Dr. Mathews also noted that Ms. Sandlin could take Zofran and Decafrom to treat her nausea.  (*Id.*).

Dr. Mathews evaluated Ms. Sandlin after her first round of chemotherapy. (Doc. 5-9, p. 78).  Overall, Ms. Sandlin was "stable."  (*Id.*).  Dr. Mathews noted that Ms. Sandlin "did have quite a bit of diarrhea after her first cycle.  It is not clear if this was chemo related or if she could have a coincidental virus."  (*Id.*).  Dr. Mathews prescribed Bentyl to treat the diarrhea, and he maintained Ms. Sandlin's other medications.  (*Id.*).

Less than a week later on June 21, 2011, Ms. Sandlin returned to Clearview Cancer Institute "due to an urgent complaint of severe abdominal pain with cramping.  The pain was so severe that [] a STAT CT of the abdomen and pelvis" was ordered.  (Doc. 5-9, p. 72).  CT results showed a possible "benign bone island."  (*Id.*).  Although the CT was negative with regard to diarrhea and cramping, Ms. Sandlin was prescribed "Librax three times a day" to alleviate both conditions.  (*Id.* at 73).  Ms. Sandlin also continued to suffer gastroesophageal reflux, and she was instructed to continue taking Prilosec.  (*Id.*).  The record from Ms. Sandlin's June 21, 2011 visit to the Cancer Institute does not make clear whether Ms. Sandlin saw a doctor or a physician's assistant or a nurse.  The record indicates that Ms. Sandlin did not have an appointment and that she was a "work-

in" because of her urgent condition.   The record states that Ms. Sandlin was scheduled to see Dr. Mathews again on June 23, 2011.  (Doc. 5-9, pp. 72-73).

Records ranging from July 14, 2011 to September 15, 2011 indicate that Ms. Sandlin's severe symptoms subsided.  Dr. Mathews noted that Ms. Sandlin had "[n]o major problems to report," (Doc. 5-9, p. 67); she "overall is doing well," (*Id.* at 62) and had "no complaints," (*Id.* at 57).  In fact, based on his examination of Ms. Sandlin on July 14, 2011, Dr. Mathews wrote that Ms. Sandlin "had fantastic tolerance of her chemotherapy last time," and she was preparing for her last two rounds of treatment.  (Doc. 5-9, p. 67).  Between July and September 2011, nausea was a reoccurring problem, but Ms. Sandlin received medication to treat the nausea.  (*Id.* at 58, 67).  A July 12, 2011 note from Ms. Sandlin's plastic surgeon stated that Ms. Sandlin "has a history of migraines, which are frequent with her chemotherapy." (Doc. 5-10, p. 116).

When Ms. Sandlin visited the Cancer Institute on October 6, 2011, she had completed six cycles of TCH chemotherapy, and she was taking a weekly regimen of Herceptin and Taxol.  Ms. Sandlin reported "that she [had] noticed she has been having more migraine like headaches lately, not relieved by her regular pain medications." (Doc. 5-10, p. 96).  Dr. Mathews prescribed Fiorinal to treat the migraine headaches.  (*Id.* at 95-97).

One week later, Ms. Sandlin reported that the Fiorinal "did not help a great deal" and that she was "still having some joint pain," though her Lortab seemed "to help more." (Doc. 5-10, p. 94). Her nausea continued, but it was "better than last time." (*Id.*). To address the nausea, Dr. Mathews moved Ms. Sandlin to a "Sancuso patch." (*Id.* at 94-95). Ms. Sandlin planned to take Excedrin migraine and Lortab "as needed" to treat her headaches. (*Id.* at 95).

On October 20, 2011, Dr. Mathews noted that, "[o]verall, [Ms. Sandlin] is much better. Counts are stable. Nausea has been eliminated for now. Headaches have been better. Pain has been controlled. She still has fatigue, but otherwise is doing well." (Doc. 5-10, p. 92). Dr. Mathews reported that the Sancuso patch helped Ms. Sandlin's nausea "a good bit." (Doc. 5-10, p. 93). Dr. Mathews gave Ms. Sandlin a work note limiting her to "light duty" because her employer instructed her to return to work for 30 days to qualify for additional short term disability. (*Id.*). Ms. Sandlin was concerned "that she simply [would not] have enough energy to do her previous full time work, but she is in a hard situation needing to keep her financial and insurance status stable." (*Id.*).

On October 27, 2011, Dr. Mathews noted "no issues to report aside" from Ms. Sandlin continuing on her plan to switch chemotherapy drugs. (Doc. 5-10, p. 90). On November 21, 2011, the physician's assistant reported that Ms. Sandlin was "feeling well" with some fatigue issues after returning to work "but is

otherwise stable." (*Id.* at 88).  Ms. Sandlin's nausea was no longer an issue, and she was "doing better with Lortab" treatment for her migraines.  (*Id.* at 89).  Ms. Sandlin received "notes for work to return to work but to remain at the light duty post" she was filling.  (*Id.*).

By December 15, 2011, Ms. Sandlin's condition had worsened.  Dr. Mathews noted that Ms. Sandlin "had nausea, vomiting, and headaches over the past week." (Doc. 5-10, p. 86).  Dr. Mathews attributed the symptoms to a virus. (Doc. 5-10, pp. 86-87).  He prescribed "fluids and Aloxi" for nausea and "a Z-pak and Medrol-Dosepak" for sinusitis.  (*Id.*).

On January 3, 2012, Dr. Mathews noted that while Ms. Sandlin was "stable," she "continues to have a number of problems."  (Doc. 5-10, p. 84).  She suffered "nausea with occasional episodes of vomiting" and "headaches… not clearly sinus in nature."  She also complained of "decreased energy and appetite," and "hot flashes." (*Id.*).  Dr. Mathews decided to adjust Ms. Sandlin's medication, and he ordered a CT scan to explore the cause of her sinusitis and headaches.  (*Id.* at 84-85).

Treatment notes from January 12, 2012 state that Ms. Sandlin suffered from "numerous and frequent headaches which have not been alleviated by NSAIDS or prescription butabital."  (*Id.* at 82).  The headaches occasionally caused nausea. (*Id.*).  Ms. Sandlin's hot flashes and decreased energy continued, but Ms. Sandlin

was "feeling much better," and her hot flashes had improved in response to Celexa. (*Id.* at 83).

When Dr. Mathews examined Ms. Sandlin on January 26, 2012, he noted that Ms. Sandlin was "stable," though she "continues to have lots of headaches" and required an "urgent" appointment with a neurologist. (Doc. 5-10, p. 80). Dr. Mathews stated that he hoped to see improvement because Ms. Sandlin was "off chemotherapy." (*Id.*). On February 16, 2012, a physician's assistant indicated that Ms. Sandlin was still "on maintenance Herceptin." (Doc. 5-10, p. 78). Ms. Sandlin "continue[d] to have persistent headaches although Imitrex has helped quite a bit. She is having to take Imitrex on a daily basis so we certainly have not lessened her headaches." (*Id.*). The physician's assistant noted that Ms. Sandlin suffered from "[c]hronic pain issues." (*Id.* at 79).

On March 5, 2012, Dr. Mathews reported that Ms. Sandlin's "[h]eadaches [had] almost completely resolved within several days of starting amitriptyline," and he remarked that "except for grade I or II peripheral neuropathy she is doing very well." (Doc. 5-10, p. 76). With respect to the neuropathy, Dr. Mathews stated "unfortunately I have little to offer," and he suggested increasing Ms. Sandlin's dosage of amitriptyline. (*Id.*).

Ms. Sandlin saw Dr. Scott Hitchcock, a neurologist, on March 3, 2012.  Dr. Hitchcock noted that Ms. Sandlin's chief complaint was headaches.  With respect to those headaches, Dr. Hitchcock reported:

> She has a history of previous headaches.  Typically, when she had a headache it would be around her menstrual cycle.  Her headaches were not really much of a problem until after the chemo.  She then developed a daily headache.  It was usually left-sided and throbbing, as well as quite severe. It was associated with photophobia, phonophobia, as well as osmophobia.  Sometimes the headaches would be triggered by smells.  She would have to hibernate in a dark quite [sic] room.  Imitrex 50 mg was of some help.  The headaches would go on for hours at a time.  They were worse with activity and better with sleep.  Since she started a small dose of amitriptyline, her headaches have completely resolved.  She tells me that she has not had a headache for about two to three weeks now.

(Doc. 5-11, p. 36).   Dr. Hitchcock also noted that Ms. Sandlin developed neuropathy following her chemotherapy treatments.  He explained:

> She has a burning and stinging pain in her fingers, toes and feet.  She has difficulty telling the temperature of water with her hands and feet.  She does have a significant amount of spontaneous pain, as well as allodynia.  She has noticed that this may have improved just a bit with amitriptyline, but is still a significant problem.

(Doc. 5-11, p. 36).

Dr. Hitchcock diagnosed Ms. Sandlin with peripheral neuropathy which Dr. Hitchcock suspected was "fairly mild."  (Doc. 5-11, p. 37).  Dr. Hitchcock stated:

> Her reflexes are generally intact except for being slightly decreased at the ankles.  Vibratory sensation was only minimally decreased at the toes.  Therefore, I suspect the neuropathy is likely not that severe.  Hopefully over time, she will make a spontaneous recovery.

(Doc. 5-11, p. 37).  Dr. Hitchcock described Ms. Sandlin's migraine headaches as "typical," explained the steps that Ms. Sandlin had to take to address the photophobia that accompanied the headaches, and prescribed an increased dose of amitriptyline to which Ms. Sandlin had had "an excellent response" and advised Ms. Sandlin that she could take two Imitrex "to help better abort the headache." (*Id.*).

On April 16, 2012, Dr. Mathews noted that "overall" Ms. Sandlin was "relatively stable," but her "headaches have recurred," along with "pretty substantial bone and muscular pain, which has worsened as well."  (Doc. 5-10, p. 74).  Dr. Mathews began to suspect Herceptin might be the cause of Ms. Sandlin's problems.  (*Id.*).  Dr. Mathews decided to maintain the course of her treatment because Ms. Sandlin was almost done with her Herceptin treatment.  (*Id.* at 74-75).

On May 7, 2012, Dr. Mathews noted that Ms. Sandlin returned to "complete her Herceptin," "had a lot of issues with Tamoxifen," and had injured her back after her last visit.  (Doc. 5-10, p. 72).  Dr. Mathews indicated that Ms. Sandlin's headaches were "much better," and he hoped she would continue to improve.  (*Id.*). During a July 18, 2012 examination, Dr. Mathews reported that Ms. Sandlin "had quite a bit of intolerance" of Tamoxifen.  (*Id.* at 70).  Dr. Mathews stated that Ms. Sandlin's neuropathy and headaches were "stable to improving."  (*Id.*).

On November 7, 2012, Dr. Mathews examined Ms. Sandlin, noting "[s]he has had quite a bit of arthritic type pain, largely associated with getting back to work and has also had an occasional migraine but has had good control on amitriptyline." (Doc. 5-10, p. 68). Dr. Mathews wanted to start Ms. Sandlin "back on half a dose of tamoxifen every other day" to deal with her "substantial pain and other symptoms." (*Id.*). Ms. Sandlin's neuropathy was "stable to improved," though Dr. Mathews found that her condition "seems to be aggravated more by getting up." (*Id.*). He noted that Ms. Sandlin "is not attempting to go back to a very physical job." (*Id.*). At Ms. Sandlin's request, Dr. Mathews ordered her to begin taking only amitriptyline for her headaches so that she could "drop her medications." (*Id.*). Dr. Mathews stated, "I think once she is up and about a good bit more, I think she will feel a lot better." (*Id.* at 69).

During a December 19, 2012 visit, Dr. Mathews noted that Ms. Sandlin's arthritic pain and headaches had improved and that she had returned to work. (Doc. 5-10, p. 66). He explained that her previous hot flashes were due to menopause. (*Id.*). Dr. Mathews restarted Ms. Sandlin on Tamoxifen and planned to review her progress in two months. (*Id.* at 67).

Based on these medical records, there is some evidence that supports the ALJ's decision to discount Ms. Sandlin's testimony about the severity of her pain. For example, Ms. Sandlin's medical records suggest that she was not constantly in

pain, and her testimony that she was bedridden is inconsistent with evidence of periods of controlled nausea and reduced abdominal cramping. (Doc. 5-9, pp. 42, 57-58, 67; Doc. 5-10, p. 92). But there also is a good deal of evidence that the ALJ did not discuss in her opinion that supports Ms. Sandlin's testimony. The ALJ properly noted that to evaluate Ms. Sandlin's pain, she (the ALJ) would have to examine a variety of factors such as Ms. Sandlin's daily activities, the types of medication prescribed to alleviate pain, and "[a]ny measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back . . .)." (Doc. 5-3, pp. 28-29). Yet, the ALJ's opinion contains no indication that the ALJ considered, for example, the amount of time that Ms. Sandlin reportedly had to stay in the bathroom or the cocktail of medications that Ms. Sandlin used to treat her nausea, diarrhea, neuropathy, and migraine headaches. Similarly, the ALJ's opinion does not acknowledge the steps that Ms. Sandlin used to try to manage her migraine headaches such as "hibernating" in a darkened room.

An ALJ does not have to mention every piece of evidence in an opinion, but an ALJ must acknowledge the evidence that is favorable to a claimant and explain how that evidence factored into her analysis of the administrative record. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (If the record viewed in its entirety indicates that the ALJ "focus[ed] upon one aspect of the evidence and

ignor[ed] other parts of the record," then the reviewing court "cannot properly find that the administrative decision is supported by substantial evidence. It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence.  The review must take into account and evaluate the record as a whole.").[6]  On remand, the ALJ should consider the administrative record as it pertains to the closed period of disability that ranges from the date of Ms. Sandlin's mastectomy through her return to work in January 2013.[7]

## V.    CONCLUSION

For the reasons discussed above, the Court remands the decision of the Commissioner for reevaluation of Ms. Sandlin's request for benefits for the closed period of time ranging from March 16, 2011 through January 1, 2013.  The Court will enter a separate order consistent with this memorandum opinion.

---

[6]  The ALJ found that Ms. Sandlin had not been under a disability from March 16, 2011 through the date of the ALJ's decision in part because Ms. Sandlin "completed her Associate's degree in April 2011, less than a month after undergoing a double mastectomy." (Doc. 5-3, p. 30).  Ms. Sandlin explained "[t]hat was the year the tornados hit.  So school ended early." (*Id.* at 50). Given the evidence that Ms. Sandlin had a double mastectomy on March 30, 2011, it is unlikely that Ms. Sandlin had school work that she had to complete after her surgery because her classes were cancelled.

[7] The ALJ did not discuss whether Ms. Sandlin's intermittent work during the closed period of disability constituted substantial gainful activity.  (Doc. 5-3, pp. 26-27).  If the ALJ decides on remand that this employment constitutes substantial gainful activity, then the ALJ must determine how long Ms. Sandlin was disabled during the relevant period.  The Eleventh Circuit has held that "[s]ubstantial gainful activity clearly *does* bar benefits under the statute regardless of any actual disability of the claimant. But it bars such benefits *only* for such periods of activity."  *Powell o/b/o Powell v. Heckler*, 773 F.2d 1572, 1576 (11th Cir. 1985) (emphasis in original).

**DONE** and **ORDERED** this September 14, 2016.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE